# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| STEVEN ROSS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:12-2173 |
| | § | |
| CAROLYN W. COLVIN, ACTING | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

In this case seeking judicial review of denial of Supplemental Security Income

benefits, Plaintiff Steven Ross has filed a Motion for Summary Judgment [Doc. # 7]

("Plaintiff's Motion"). Defendant Carolyn W. Colvin, Acting Commissioner of Social

Security, has filed a Motion for Summary Judgment [Doc. # 8] ("Defendant's

Motion") and a Memorandum in Support [Doc. # 9] ("Defendant's Memorandum").

The motions now are ripe for decision. Having considered the parties' briefing, the

applicable legal authorities, and all matters of record, the Court concludes that

Defendant's Motion should be **granted** and that Plaintiff's Motion should be **denied**.

# I.   BACKGROUND

## A.   Procedural Background

Ross filed an application for Supplemental Security Income ("SSI") benefits with the Social Security Administration ("SSA") on September 16, 2009, alleging disability beginning December 30, 2008.  The claim was denied initially and on reconsideration.   Ross then requested an administrative hearing before an Administrative Law Judge ("ALJ") to review the denial of benefits.

On January 26, 2011, ALJ Rita R. Carroll held a hearing in Nacogdoches, Texas.[1]  Ross was represented by attorney R. G. Willis.  Susan Brooks, an impartial vocational expert, appeared at the hearing.  No medical expert was called.  In a decision dated April 18, 2011, the ALJ denied Ross' application for benefits.[2]  On May 12, 2012, the Appeals Council denied Ross' request for review, rendering the ALJ's decision final.[3]

Ross filed this case on July 12, 2012, seeking judicial review of the Commissioner's denial of his claim for benefits.

---

[1]     R. 22-67.

[2]     R. 8-16.

[3]     R. 1-3.

B.      **Factual Background**

Ross claims that he suffers from multiple medical conditions, including herniated disk of the lumbar spine; foot pain; learning disorder; depression; diabetes mellitus; bronchial asthma; obesity; obstructive sleep apnea; right eye blindness; and peripheral neuropathy.  The relevant period of inquiry begins on December 30, 2008, the alleged onset date identified by Ross, at which point Ross was 39 years old.

On March 2, 2009, Ross was treated at in the  emergency room of the Memorial Medical Center in Lufkin for chest pain, congestion, and shortness of breath.[4]  His discharge instructions indicate diagnoses of chronic bronchitis, emphysema, and hypertension.  He was given medication and instructed to follow up in five to seven days.

Soon thereafter, Ross received follow up treatment at the Angelina County & Cities Health District in Lufkin ("the Angelina Clinic").[5]  He was instructed to stop smoking and was referred to surgery for evaluation of a possible abdominal hernia.

In April 2009, Ross was treated by Gregory DeArmond, M.D., a surgeon, and complained of pain and difficulty breathing when leaning over.  Dr. DeArmond diagnosed an umbilical hernia and noted that Ross, who then weighed 317 pounds,

---

[4]      R. 395-417.

[5]      R. 268-73.

had recently gained 60 pounds.  On April 16, 2009, Dr. DeArmond performed surgery to repair the hernia.[6]

In June 2009, Ross was treated at the Angelina Clinic and complained of swelling in his legs and arms, hypertension, edema, and leg and knee pain.[7]  In August, he complained of a herniated lumbar disk that was causing numbness and tingling in his legs and lower back pain.  He also complained of a knot and pain in his right foot.[8]  A subsequent MRI of his lumbar spine showed "minimal-to-mild neural foraminal narrowing and minimal canal narrowing at L4-5" and multilevel disc dessication with "minimal" disc bulge and herniation at L1-2.[9]  An MRI of his right foot showed no acute bony abnormalities but a "large ununited apophysis at the base of the fifth metatarsal" and "foreshortening of the proximal phalanx of the right great toe."[10]  On August 31, 2009, at a follow-up Clinic visit, Ross complained of the knot on his right foot and of pain when walking.  He was referred to a podiatrist and was also referred for a pulmonary sleep study.[11]  On September 24, 2009, he complained

---

[6]      R. 381-89.

[7]      R. 279-83.

[8]      R. 288-89.

[9]      R. 322.

[10]     R. 323.

[11]     R. 267, 273, 291.

of a cough and tachycardia, or an abnormally rapid heartbeat.[12]

On October 8, 2009, Ross was treated at Memorial Medical Center's emergency room for syncope (fainting) and dizziness, and reported that he had driven his car into a ditch.[13]  Medical personnel performed  CT scans of Ross' brain and head and an x-ray of his chest, none of which revealed abnormalities.[14]

On October 30, 2009, Ross was treated by James M. Stocks, M.D., at a Sleep Clinic at the University of Texas Health Science Center at Tyler.   Dr. Stocks noted a history of morbid obesity, asthma, obstructive lung disease, hypertension, severe degenerative joint disease, and smoking.  Ross complained of excessive daytime sleepiness, loud snoring, breathing troubles while sleeping, and morning headaches. He also reported that he had recently fallen asleep while driving and "had a near accident." Dr. Stocks diagnosed him with sleep apnea and Ross began treatment with a nasal CPAP machine.[15]   His notes state that Ross was "unable to work" at the present time and was seeking disability.[16]  During a November visit at the Angelina Clinic, Ross reported that he was feeling much better since sleeping with the CPAP

---

[12]     R. 296-97.

[13]     R. 350-78.

[14]     R. 361-63.

[15]     R. 330-34.

[16]     R. 332.

machine.[17]  At a December follow-up visit with Dr. Stocks, Ross again reported that the CPAP machine had dramatically improved his sleep and that his daytime sleepiness had decreased significantly.  However, Dr. Stocks suspected that daytime sleepiness would be a persistent problem due to Ross' morbid obesity.[18]

In December 2009, Ross was treated at the Burke Center in Lufkin for depression.  He reported depressed feelings, feeling uncomfortable around other people, occasionally hearing mumbling voices or seeing shadows, recent weight gain of 138 pounds, and a history of past substance abuse.  He denied suicidal or homicidal ideation, did not present a risk of harm to himself or others, and had been sober for six years.  He reported family problems as well as financial and legal stressors.  The Burke Center's diagnostic screeners judged Ross not to be part of the center's priority population, and referred him for care in the community.[19]

Ross continued treatment at the Angelina Clinic.  In December 2009, he reported pain in his knees from torn cartilage.  He also reported that, although he had seen a podiatrist for treatment of his right foot and had been treated by medications and withdrawal of fluids, he had continued foot pain and could not wear a shoe for

---

[17]     R. 446.

[18]     R. 344.  Ross' weight at the time was 361 pounds.

[19]     R. 576-94.

long.[20]   In January 2010, he reported worsening pain in his knees and feet, and continued shortness of breath.  He also reported his depression and was given a prescription for Cymbalta, among other medications.[21]  Ross was referred back to Dr. DeArmond for a possible ventral hernia.

On February 24, 2010, Dr. DeArmond stated that Ross had "a rectus diatasis, rather than a true ventral hernia." His records indicate that "there is no surgical intervention that is useful for this condition," and that he advised Ross to become aggressive about weight loss, including diet and exercise, for relief of his aches and pains.[22]

On April 18, 2010, Ross was treated at the emergency room of Memorial Medical Center for shortness of breath and respiratory abnormalities.  He was diagnosed with an exacerbation of his bronchial asthma secondary to a case of acute bronchitis.   He was treated and discharged with medications and follow-up instructions.[23]   In May and June, he continued to report uncontrolled breathing problems in follow-up visits at the Angelina Clinic.  Medical personnel adjusted and

---

[20]     R. 443-44.

[21]     R. 441-42.

[22]     R. 551.

[23]     R. 595-612.

changed his medications, and referred him to George Sushil, M.D., a pulmonary specialist.[24]

Ross saw Dr. Sushil on June 11, 2010, and reported shortness of breath, coughing and wheezing, and dizziness when coughing.  At this point, Ross was 41 years old.  Dr. Sushil prescribed medications and instructed Ross to stop smoking and lose weight.[25]  At a follow-up visit in September, Ross stated that he had quit smoking in July but had continued shortness of breath and wheezing.  Dr. Sushil adjusted his medications and gave him some pharmaceutical samples.[26]  Throughout this period, Ross continued treatment at the Angelina Clinic for his breathing problems, among other conditions.[27]

On August 24, 2010, Ross was treated at the emergency room for chest pain, pleurisy, and asthma.  An x-ray of his chest was normal. He was discharged with medications and instructions.[28]

In the fall of 2010, Ross continued treatment at the Angelina Clinic for

---

[24]     R. 615-18.

[25]     R. 622-27.

[26]     R. 628-31.

[27]     R. 658-64.

[28]     R. 633-49.

respiratory problems and tobacco addiction. In November, he reported that his breathing was "much better but still not great." He complained of worsening pain and stiffness in his hands and knees.[29]   In December 2010, Ross had a follow-up appointment with Dr. Sushil and reported continued shortness of breath, wheezing, and coughing; his medications were adjusted.[30]

On December 8, 2010, Ross returned to the Sleep Clinic for a follow-up visit with Dr. Stocks. Dr. Stocks noted that Ross was still morbidly obese but had lost 21 pounds in the past year and was motivated to lose more. His respiratory symptoms were noted as "stable" but Ross was unable to afford routine medications. Dr. Stocks noted "slight wheezing." Ross was compliant with CPAP treatment for sleep apnea with clear benefits, although he still had some daytime sleepiness. Dr. Stocks instructed Ross to continue his treatments and come for a follow-up appointment in one year. His notes state that he expected Ross to be granted the disability benefits for which he had applied "since is clearly is not capable of working because of health problems."[31]

On December 16, 2010, Ross was treated at the emergency room for

---

[29]   R. 652-57.

[30]   R. 734-37.

[31]   R. 732.

uncontrolled diabetes and was admitted to Memorial Medical Center.  He complained of fatigue progressively worsening over two weeks, polydipsia (excessive thirst), polyuria (excessive urination), and blurry vision.  He was placed on an insulin protocol and hydrated.  He was discharged on December 20, 2010, with instructions to monitor his blood sugar and to follow up at the Angelina Clinic.[32]  He was seen at the Clinic the next day.  The Clinic's records indicate that his diabetes was "controlled" but that Ross complained of sharp back pain and his herniated lumbar disc was "unstable."[33]

On January 26, 2011, Ross appeared for a benefits hearing before the ALJ.[34] Ross testified that he is unable to read, write, or do simple math.[35]  He stated that he had not worked since December 30, 2008, and would be unable to do his previous work as a plumber's helper due to back pain and numbness in his legs.[36]  He further testified that he had been fired from his previous work as a mower because he could

---

[32]     R. 669-729.

[33]     R. 740-44.

[34]     R. 22-67.

[35]     R. 26.

[36]     R. 29.

not keep up with other workers due to shortness of breath.[37]  He stated that he could

not walk more than 45-50 feet, or stand more than 10-15 minutes, without back pain

and numbness.[38]  He reported constant pain in his back and trouble breathing, as well

as pain in his right foot.  He stated that he was trying to quit smoking and had cut back

to two cigarettes a day.  He was following a diabetic diet.[39]  He testified that he was

driving again, and helped his father around the house by cooking, doing dishes, and

running errands.[40]

Plaintiff states that, on the basis of a subsequent application for benefits, he has

been found disabled and granted benefits as of July 12, 2012.

## II.   <u>SUMMARY JUDGMENT STANDARD</u>

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary

judgment, after adequate time for discovery and upon motion, against a party who

fails to make a sufficient showing of the existence of an element essential to the

party's case, and on which that party will bear the burden at trial.[41]  "The court shall

---

[37]   R. 56-57.

[38]   R. 33.

[39]   R. 38-39.

[40]   R. 31.

[41]   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.,* 37 F.3d
(continued...)

grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[42]  "An issue is material if its resolution could affect the outcome of the action.  A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[43]

## III.   STANDARD OF REVIEW

Judicial review of the Commissioner's denial of disability benefits is limited to two inquiries: first, whether the final decision is supported by substantial evidence on the record as a whole and, second, whether the Commissioner applied the proper legal standards to evaluate the evidence.[44]  "Substantial evidence" is relevant evidence that a reasonable mind might accept as adequate to support a conclusion.[45]  It is more than

---

[41]     (...continued)
1069, 1075 (5th Cir. 1994) (en banc); *see also Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.,* 289 F.3d 373, 375 (5th Cir. 2002).

[42]     FED. R. CIV. P. 56(a).  *See Celotex Corp.*, 477 U.S. at 322–23; *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008).

[43]     *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (internal citations and quotation marks omitted).

[44]     *See Audler v. Astrue*, 501 F.3d 446, 447 (5th Cir. 2007); *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).

[45]     *Audler*, 501 F.3d at 447 (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

a mere scintilla and less than a preponderance.[46]

When applying the substantial evidence standard on review, the court scrutinizes the record to determine whether such evidence is present.[47]  In determining whether substantial evidence of disability exists, the court weighs four factors: (1) objective medical evidence; (2) diagnoses and opinions; (3) the claimant's subjective evidence of pain and disability; and (4) the claimant's age, education, and work history.[48]  If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[49]  Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision.[50]  The court may not, however, reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner.[51]  In short, conflicts in the evidence are for the Commissioner, not the courts, to resolve.[52]

---

[46]   *Id.*; *Perez*, 415 F.3d at 461; *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000).

[47]   *Perez*, 415 F.3d at 461; *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

[48]   *Perez*, 415 F.3d at 462 (citing *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991)).

[49]   *Id.* at 461 (citing *Richardson*, 402 U.S. at 390); *Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002).

[50]   *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).

[51]   *Audler*, 501 F.3d at 447; *Masterson*, 309 F.3d at 272.

[52]   *Perez*, 415 F.3d at 461; *Masterson*, 309 F.3d at 272.

## IV.    ANALYSIS

## A.    Statutory Basis for Benefits

Ross applied for Supplemental Security Income (SSI) benefits.  SSI benefits are authorized by Title XVI of the Social Security Act, and provide an additional resource to the aged, blind and disabled to assure that their income does not fall below the poverty line.[53]  Eligibility for SSI is based on proof of disability[54] and indigence.[55]  A claimant applying to the SSI program cannot receive payment for any period of disability predating the month in which he applies for benefits, no matter how long he has actually been disabled.[56]  Thus, the month following an application fixes the earliest date from which SSI benefits can be paid.  Eligibility for SSI, unlike eligibility for Social Security disability benefits, is not dependent on insured status.

"Disability" is defined by the Act as the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

---

[53]    20 C.F.R. § 416.110.

[54]    42 U.S.C. § 1382c(a)(3) (definition of disability).

[55]    42 U.S.C. §§ 1382(a) (financial requirements).

[56]    *Brown v. Apfel*, 192 F.3d 492, 495 n.1 (5th Cir. 1999); 20 C.F.R. § 416.335.

expected to last for a continuous period of not less than twelve months."[57]   The law and regulations governing the determination of disability for SSI are the same as those governing determinations for Social Security disability benefits.[58]

## B.   **Determination of Disability**

When determining whether a claimant is disabled, an ALJ must engage in a five-step sequential inquiry, as follows: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment in Appendix 1 of the regulations; (4) whether the claimant is capable of performing past relevant work; and (5) whether the claimant is capable of performing any other work.[59]   The claimant has the burden to prove disability under the first four steps.[60]   If the claimant successfully carries this burden, the burden shifts to the Commissioner at Step Five to show that the claimant is capable of performing other substantial gainful

---

[57]   42 U.S.C. § 1382c(3)(A).

[58]   *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

[59]   *Perez*, 415 F.3d at 461; *Newton*, 209 F.3d at 453.   The Commissioner's analysis at Steps Four and Five is based on the assessment of the claimant's residual functional capacity ("RFC"), or the work a claimant still can do despite his or her physical and mental limitations.   *Perez*, 415 F.3d at 461-62.   The Commissioner assesses the RFC before proceeding from Step Three to Step Four.   *Id.*

[60]   *Perez*, 415 F.3d at 461; *Myers*, 238 F.3d at 619.

employment that is available in the national economy.[61]  Once the Commissioner

makes this showing, the burden shifts back to the claimant to rebut the finding.[62]  A

finding that a claimant is disabled or is not disabled at any point in the five-step

review is conclusive and terminates the analysis.[63]

In this case, the ALJ determined at Step One that Ross had not engaged in

substantial gainful activity since September 16, 2009, his application date.  At Step

Two, she found that Ross had eight severe impairments: herniated disk of the lumbar

spine; foot pain; learning disorder; depression; diabetes mellitus; bronchial asthma;

obesity; and obstructive sleep apnea.  She rejected Ross' claim that his right eye

blindness was an additional severe impairment.  At Step Three, she found that Ross'

impairments, considered singly or in combination, did not meet or medically equal an

impairment listed in the Social Security regulations.

Before proceeding to Step Four, the ALJ found that Ross had the residual

functional capacity ("RFC") to perform work as follows:

> [Ross] has the [RFC] to sustain work while lifting and carrying 20
> pounds occasionally and 10 pounds frequently.  He is able to stand/walk
> for 4 of 8 hours and sit for 6 of 8 hours.  The claimant is restricted from
> climbing ropes, ladders, and scaffolds.  He can occasionally balance,

---

[61]    *Perez*, 415 F.3d at 461; *Masterson*, 309 F.3d at 272; *Greenspan*, 38 F.3d at 236.

[62]    *Perez*, 415 F.3d at 461; *Newton*, 209 F.3d at 453.

[63]    *Perez*, 415 F.3d at 461 (citing 20 C.F.R. § 404.1520(a)).

stoop, kneel, crouch, and crawl.  The claimant must avoid exposure to concentrated fumes, chemicals, and smoke.  From a mental standpoint, the claimant is limited to simple work for an individual who is functionally illiterate.[64]

At Step Four, the ALJ determined that Ross was unable to perform his past relevant work as a plumber's helper and molder.   At Step Five, she determined that, considering Ross' age, education, work experience, and RFC, Ross was capable of performing jobs that existed in significant numbers in the national economy, in particular, garment sorter, general packager, and shoe packer.   She therefore concluded that Ross was not disabled.

## C.   Plaintiff's Arguments for Reversal

Plaintiff urges three grounds for reversal of the Commissioner's decision.

### 1.   Treating Physician's Opinion regarding Disability

Plaintiff first argues that the ALJ improperly failed to give any weight to the opinion of a treating physician that Ross was disabled.  When deciding Ross' claim, the ALJ stated, "The record does not contain any opinions from treating or examining physicians indicating that the claimant is disabled."[65]   However, Plaintiff points to records of Dr. Stocks, who treated Ross for sleep apnea.  The doctor's notes from his initial examination of Ross on October 30, 2009, state in part, "The problem [with]

---

[64]     R. 11-12.

[65]     R. 14.

this patient is that at the present time *he is unable to work*."[66]   Moreover, on

December 9, 2010, at Ross' annual follow-up examination, Dr. Stocks stated,

"Ultimately, this patient, I expect, [will be] granted disability since *he clearly is not*

*capable of working* because of health problems."[67]   In both cases,  Dr. Stocks'

statements were brief and were not explicitly connected to Ross' diagnosis of sleep

apnea.  The statements were not supported by any reasons or any medical evidence.

Plaintiff argues that the ALJ's failure to give weight to the opinion of Dr.

Stocks, a treating physician, violated *Newton v. Apfel* and other Fifth Circuit authority.

Clear Fifth Circuit precedent requires an ALJ to give "controlling weight" to a treating

physician's medical opinion, if the opinion is "well-supported by medically acceptable

clinical and laboratory diagnostic techniques" and "not inconsistent" with other

substantial evidence in the record.[68]   The treating physician's opinion is not

conclusive, however, and the decision regarding the claimant's status rests with the

ALJ.[69]   An ALJ may discount the weight given to a treating physician's opinion for

"good cause" when the treating physician's statements are brief and conclusory, are

---

[66]     R. 332 (emphasis added).

[67]     R. 732 (emphasis added).

[68]     *Newton*, 209 F.3d at 455 (internal quotation marks and citations omitted).  *See Giles v. Astrue*, 433 F. App'x 241, 246 (5th Cir. 2011); *Beasley v. Barnhart*, 191 F. App'x 331, 334 (5th Cir. 2006).

[69]     *Myers*, 238 F.3d at 621; *Greenspan*, 38 F.3d at 237.

not supported by medically acceptable clinical, laboratory, or diagnostic techniques, or are otherwise unsupported by the evidence.[70]  An "isolated, conclusory statement" of a treating physician may be rejected when it is considered in conjunction with other medical opinions, the objective medical evidence, and the claimant's own testimony.[71]

In this case, however, the opinions at issue were not medical opinions like those at issue in *Newton*, but rather Dr. Stocks' conclusory statements that Ross was unable to work.  The decision as to whether a claimant is able to work or is "disabled" under the SSA is an administrative issue that is reserved to the Commissioner. Although a treating physician's ***medical*** opinion must be carefully evaluated by the ALJ, the physician's opinion that a claimant is disabled or unable to work is not given special significance.[72]  The statements made by Dr. Stocks lie outside the scope of *Newton*'s requirements that a treating physician's medical opinion be given controlling weight, or that the ALJ consider certain factors before discounting the opinion.[73]

---

[70]     *Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 456.  *See Beasley*, 191 F. App'x at 334.

[71]     *Myers*, 238 F.3d at 621; *Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995).

[72]     *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003) (determination of disability or inability to work is a legal conclusion reserved to the Commissioner) (citing 20 C.F.R. § 404.1527(d)).

[73]     *See Frank*, 326 F.3d at 620; *Newton*, 209 F.3d at 455-56.  In addition to being brief and unsupported by medical evidence, Dr. Stocks' statements regarding Ross' ability to work appear to be ancillary to his treatment of Ross for sleep apnea.  In fact, Dr. Stocks' records from 2010 indicate that Ross had responded well to his treatment for
(continued...)

Therefore, although the ALJ was incorrect when she stated in her written opinion that the record contained no physician's opinion that Ross was disabled, this misstatement does not justify reversal or remand.[74]   Despite this incorrect statement, the ALJ stated at the hearing that she was aware of Dr. Stocks' opinion that Ross was unable to work.[75]   Moreover, the ALJ reviewed all of the medical evidence of record, including the evidence pertaining to Ross' sleep apnea, as well as the evidence of all of his other medical convictions.[76]   This error accordingly does not infect the ALJ's ultimate decision, which is supported by substantial evidence.

## 2.   Severity of certain additional impairments

Ross argues that the ALJ erred at Step Two when she failed to find his impaired vision and peripheral neuropathy to be "severe" impairments.  Ross relies on *Stone v.*

---

[73]   (...continued)
apnea and his respiratory symptoms were stable.  Dr. Stocks set him for a follow-up appointment a full year hence.  R. 732.  The ALJ in this case did not make any determinations that conflicted with Dr. Stocks' medical evaluation of Ross' sleep apnea.

[74]   "'Procedural perfection in administrative proceedings is not required' as long as 'the substantial rights of a party have not been affected.'"  *See Audler*, 501 F.3d at 448 (quoting *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir.1988)).  "The party seeking to overturn the Commissioner's decision has the burden to show that prejudice resulted from an error."  *Jones v. Astrue*, 691 F.3d 730, 734-35 (5th Cir. 2012) *cert. denied,* 133 S. Ct. 953 (2013) (citing *Shinseki v. Sanders,* 556 U.S. 396, 409 (2009); *Carey v. Apfel,* 230 F.3d 131, 142 (5th Cir.2000)).

[75]   R. 46.

[76]   R. 13-14.

*Heckler*, which holds that an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience."[77]

The ALJ cited the *Stone* standard in making her Step Two findings.  She held that Ross' right eye blindness was not a severe condition under *Stone*, given the evidence that the condition had begun in Ross' childhood and he had long accommodated the condition, which had not prevented him from driving or holding employment in adulthood.[78]  She did not address Ross' neuropathy at Step Two. However, at later stages of her analysis, when determining Ross' RFC, the ALJ considered all of the conditions now cited by Ross.  She again acknowledged his right eye blindness.[79]  She also discussed Ross' diagnosis of diabetes, which had caused symptoms of blurry vision in December 2010, noting that the medical evidence contained no documentation of end organ damage or frequent hospitalization.[80]  As

---

[77]  *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1995) (internal citation, quotation marks, and alteration omitted).  *See Hampton v. Bowen*, 785 F.2d 1308 (5th Cir. 1986).

[78]  R. 10.

[79]  R. 12.

[80]  R. 13.  The medical records cited by the ALJ discuss Ross' blurry vision when hospitalized, and state "if the blurry vision still persists after control of
(continued...)

for neuropathy, the ALJ took into account Ross' complaints of numbness in his legs, back pain, and limitations on sitting and standing when assessing Ross' RFC.[81]  Ross argues that his impairments affect his ability to hold full-time employment, but he does not specifically argue that he was more limited than the RFC allows.

The ALJ in this case did not deny relief based on the outcome of Step Two. Rather, she proceeded to Steps Three through Five of the sequential analysis and considered the effects of all of Ross' impairments, including his impaired vision and neuropathy.  Given this consideration of Ross' non-severe impairments at subsequent stages, the weight of the Fifth Circuit authority does not require remand under *Stone*.[82]

### 3.    Consideration by Vocational Expert of all of Ross' limitations

Finally, Ross argues that the ALJ's hypothetical questions to the Vocational Expert ("VE") did not encompass all of his limitations, in particular, his monocular vision, blurry vision, diabetic retinopathy, neuropathy, and numbness. He argues that

---

[80]    (...continued)
hyperglycemia, we will need an ophthalmology evaluation."  R. 674.  Ross cites no evidence that the blurry vision was not controlled.

[81]    R. 11-14.

[82]    *See Herrera v. Commissioner of Social Security*, 406 F. App'x 899, 903 (5th Cir. 2010); *Adams v. Bowen*, 833 F.2d 509, 512 (5th Cir. 1987); *Jones v. Astrue*, 851 F. Supp. 2d 1010, 1015-18 (N.D. Tex. 2012).

this failure was error under Fifth Circuit authority.[83]

At Ross' hearing, the ALJ asked the VE a hypothetical question regarding available jobs.  In particular, she asked the VE to consider a person of Ross' age, education, and work experience; who was limited to lifting no more than 20 pounds occasionally and ten pounds frequently; who could stand or walk four hours a day; who could sit for six hours per day; who needed a sit/stand option that permitted him to work either sitting or standing; who could not use ropes, ladders, or scaffolds, and could perform only occasional postural maneuvers; who was functionally illiterate; who could not tolerate exposure to extreme temperature or concentrated exposure to fumes, gasses, chemicals, dust, or humidity; and who was limited to simple work.[84] On the basis of these assumed limitations, the VE identified several potential occupations, including garment sorter and shoe packer.[85]

Plaintiff's briefing does not identify any additional limitations that would have been appropriate based upon Ross' vision problems, neuropathy, or numbness.  As stated previously, the ALJ determined that Ross' right-eye blindness did not cause

---

[83]     Plaintiff's Motion, at 13 (citing *Bowling v. Shalala*, 36 F.3d 431 (5th Cir. 1994); *Bagwell v. Barnhart*, 338 F. Supp. 2d 723 (S.D. Tex. 2004)).

[84]     R. 58-59.

[85]     R. 60-61.  The ALJ then asked a second hypothetical question that assumed the same limitations but further limited the ability to stand or walk to two hours per day.  R. 61. However, she ultimately relied upon the first hypothetical when determining Ross' RFC.  *See* R. 11-12.

additional functional limitations, based on evidence in the record that he previously had held employment despite the condition.  Moreover, although records from Ross' hospitalization for diabetes in December 2010 note blurred vision and retinopathy,[86] Ross cites to no evidence that those symptoms persisted after his diabetes was treated. Finally, as to his neuropathy and numbness, the ALJ's hypothetical question incorporated limitations on both sitting and standing, and specified a sit/stand option, among other limitations.  These limitations address the symptoms Ross now relies upon.

Because Ross' briefing does not identify any additional functional limitations that were warranted based upon the evidence before the ALJ, he has failed to show prejudice resulting from any alleged error.[87]  Plaintiff is not entitled to reversal or remand.

## V.  <u>CONCLUSION</u>

For the foregoing reasons, it is hereby

**ORDERED** that Defendant's Motion for Summary Judgment [Doc. # 8] is **GRANTED**.  It is further

**ORDERED** that Plaintiff's Motion for Summary Judgment [Doc. # 7] is

---

[86]   R 669-729.

[87]   *See Jones*, 691 F.3d at 734-35.

**DENIED**.

A separate final judgment will issue.

SIGNED at Houston, Texas, this 28th day of **May, 2013**.

Nancy F. Atlas
United States District Judge